IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COLLEEN YARNALL et al.        :      CIVIL ACTION
                                :
        v.                     :
                                :
THE PHILADELPHIA SCHOOL     :      NO. 11-3130
DISTRICT et al.               :

## MEMORANDUM

**L. Felipe Restrepo, J.**                            **September 30, 2014**

This is a consolidated employment discrimination case.[1]  Plaintiffs Colleen Yarnall, Nicole Boyd, Marta Ciccimaro, and Debra McKibben Marenbach are teachers employed by the School District of Philadelphia ("School District").  Plaintiffs' claims are based on alleged wrongdoing that occurred at the Thomas Mifflin School ("Mifflin") during the 2008-2009 school year, and also during 2012 and 2013.  Following motions to dismiss and motions for reconsideration, Plaintiffs' remaining claims[2] are as follows: Count I – race discrimination based on disparate treatment and a hostile work environment in violation of Title VII;[3] Count II - § 1983 claim based on equal protection of the law;[4] Count III - § 1983 claim based on violation of privacy and retaliation;[5] Count IV – race discrimination and a hostile work environment in violation of the Pennsylvania Human Relations Act;[6] Count V – race discrimination via hostile

---

[1] Plaintiffs each initiated a separate civil action against Defendants by filing a federal complaint on May 10, 2011.  Colleen Yarnall filed case number 11-cv-3130; Nicole Boyd filed case number 11-cv-3131; Marta Ciccimaro filed case number 11-cv-3132; and Debra McKibben Marenbach filed case number 11-cv-3133.  These cases were consolidated pursuant an Order, dated October 4, 2012 (ECF No. 62).
[2] The Court granted Plaintiffs' motion for leave to amend the Second Consolidated Amended Complaint. See Order, dated Aug. 21, 2014 (ECF No. 168).  Accordingly, the relevant pleading is Plaintiffs' Third Consolidated Amended Complaint ("Third Cons. Am. Compl.") (ECF. No. 169).
[3] Against the School District only.
[4] Against Defendants Dr. Shirl E. Gilbert, II, Charles Ray, III, and Shirl A. Ishmael.
[5] Against Ray only.
[6] Against all defendants.

work environment and retaliation in violation of Title VII;[7] and Count VI – punitive damages.[8] Presently before the court are the following motions: Ishmael's motion for summary judgment on Counts II, IV, and IV (ECF No. 140); The School District's motion for summary judgment on Counts I, IV, and V (ECF No. 141); Gilbert's motion for summary judgment on Counts II, IV, and VI (ECF No. 142); Ray's motion for summary judgment on Count IV (ECF No.164);[9] and Plaintiffs' motion for partial summary judgment on the issue of whether the Plaintiffs were represented by counsel during the period from May 2009 to April 2011 (ECF No. 144).  For the reasons that follow, the motions will be granted in part and denied in part.

## I.   __BACKGROUND__

Mifflin is a Pre-Kindergarten through Eighth grade public school operated by the School District in the East Falls section of Philadelphia. Stipulated Facts ("Facts") at ¶ 9 (ECF No. 143). Ray was hired as the Probationary Principal of Mifflin, effective July 1, 2008. Id. at ¶ 3.  For the first several months of the 2008-2009 school year, Gilbert served as the West Region Superintendent, and thus was responsible for supervising Ray's operation of Mifflin. Id. at ¶¶ 1, 4.  Gilbert left the West Region Superintendent position at the end of 2008, and as of January 2009, Diane Campbell Hathaway became the interim West Region Superintendent. Id. at ¶¶ 2, 4.

During the 2008-2009 school year, there were eighteen teachers at Mifflin. Facts at ¶ 10. Of those eighteen teachers, three were African American, and fourteen were Caucasian. Id. Plaintiffs were four of those fourteen Caucasian teachers. Id.  Plaintiffs each had prior experience at Mifflin: Boyd as a grade level teacher since 2005, Ciccimaro as a grade level teacher since 2007, Marenbach as a grade level teacher since 1999, and Yarnall as a learning support teacher

---

[7] Against School District only.  Marenbach does not join in this count.
[8] Against Gilbert, Ray, and Ishmael.
[9] While Ray's motion does not explicitly state the counts on which he seeks summary judgment, Ray's motion only addresses the issues related to Plaintiffs' PHRA claim.  Accordingly, Ray's motion is treated as a motion for summary judgment only with respect to Count IV.

since 2003.  Facts at ¶¶ 15-18. Ishmael was one of the African American teachers at Mifflin during the 2008-2009 school year, and served as a School Based Teacher Leader ("SBTL"). Joint Appendix ("JA") 2937-47.

Throughout the 2008-2009 school year, Plaintiffs allege that they experienced various forms of racial discrimination at Mifflin, largely due to Ray's policies and actions as the school's principal.  See Third Cons. Am. Compl.  Plaintiffs' also attribute some discriminatory conduct to Ishmael, which Plaintiffs say was either encouraged or ignored by Ray when Plaintiffs approached him about Ishmael.  Id.  Plaintiffs' complained about the situation at Mifflin in a number of ways and at a number of times throughout the 2008-2009 school year, including during a November 25, 2008, meeting that Plaintiffs had with Gilbert.  JA13, JA357-58, JA471-472, JA2290.  Despite pursuing various avenues to report the problems at Mifflin, Plaintiffs continued to experience frustrating conditions that they attributed to Ray's desire to discriminate against them due to their race.  See Third Cons. Am. Compl.

On May 15, 2009, an individual named Rodney Bradley emailed Boyd and informed her that Ray had directed him to spy on Plaintiffs.  JA106.  Ray and Bradley met for the first time at Lincoln University in August 2008.  Facts at ¶ 11.  Thereafter, Ray and Bradley had become friendly, and Ray began seeking Bradley's help regarding Mifflin.  JA1215-17.  Among other things, Ray provided Bradley with personal information regarding certain teachers at Mifflin so that Bradley could spy on them.  JA1332-33.  The School District removed Ray from Mifflin on May 15, 2009, and Ray resigned from his employment with the School District on June 30, 2009.  Facts at ¶¶ 13-14.

Boyd, Ciccimaro, Yarnall, and Ishmael continued to work at Mifflin during the 2009-2010 school year, while Marenbach, having requested and received a transfer out of Mifflin,

began working at Forrest Elementary School as of September 2009.  Facts at ¶ 18.  On January 22, 2010, Ishmael left Mifflin on an extended medical leave.  Id. at ¶ 20.  Ishmael did not return to Mifflin until April 9, 2012.  Id.  Boyd, Ciccimaro, and Yarnall claim that upon Ishmael's return to Mifflin, Ishmael resumed her antagonistic behavior towards them, and that such behavior was motivated by their race and the fact that they had pursued administrative/legal action against her.  Third Cons. Am. Compl at ¶¶ 88-109.  Boyd, Ciccimaro, and Yarnall allege that the School District discriminated against them by allowing Ishmael to return to Mifflin and create a hostile work environment during 2012 and 2013.  Id.  They also viewed the School District's decision to allow Ishmael to return to Mifflin without certain prophylactic measures as a form of retaliation for pursing administrative/legal action as a result of the incidents in the 2008-2009 school year.  Id.  During the 2008-2009 school year, the School District had an "Employee Code of Ethics."  Facts at ¶ 6.  The School District published an employee handbook in July 2008 and December 2009.  Id. at ¶ 8.  On August 24, 2011, the School District adopted a policy regarding "Unlawful Harassment."  Id. at ¶ 7.

## II.    JURISDICTION AND LEGAL STANDARD

This court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 and has jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

In ruling on a motion for summary judgment, a court must "construe the evidence in the light most favorable" to the non-moving party and grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Zimmerman v. Norfolk S. Corp., 706 F.3d 170, 176 (3d Cir. 2013); Fed. R. Civ. P. 56(a).  "A 'genuine dispute' exists if a reasonable jury could find for the nonmoving party."  Zimmerman, 706 F.3d at 176.  "Rule 56(c) mandates the entry of summary

judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.  DISCUSSION

### A.   Count I – Title VII Race Discrimination via Disparate Treatment and Hostile Work Environment

In Count I of Plaintiffs' Third Consolidated Amended Complaint, Plaintiffs allege two separate legal claims under Title VII: one for race discrimination via disparate treatment, and one for race discrimination via a hostile work environment.  I address each claim separately.

#### 1.   Title VII Disparate Treatment

Plaintiffs have presented no direct evidence that they experienced discrimination on the basis of their race.  In the absence of direct evidence, the McDonnell Douglas burden-shifting framework is applied.  Typically, the McDonnell Douglas analysis involves three steps:

> First, the plaintiff must establish a prima facie case of discrimination.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'  Finally, should the defendant carry this burden, the plaintiff them must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). When a case involves claims of reverse discrimination, as this case does, to establish a prima facie case, Plaintiffs must "present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." Iadimarco v. Runyon, 109 F.3d 151, 161 (3d Cir. 1999).  A crucial part of Plaintiffs prima facie case is "whether [they] suffered some form of 'adverse employment action' sufficient to evoke the protection of Title VII and the

PHRA." Jones, 198 F.3d at 411 (citations omitted).  The "adverse employment action" is necessary even under the modified prima facie standard that applies to reverse discrimination cases.  Mieczowski v. York City School Dist., 414 F. App'x 441, 445 (3d. Cir. 2011) (citing Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000)).

The language of 42 U.S.C. § 2000e-2(a)(1) protects against discrimination with respect to the "compensation, terms, conditions, or privileges of employment" on the basis of race.  The Third Circuit has further clarified the protection by describing an adverse employment as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Durham Life Ins. Co. v. Evans, 166 F.3d, 139, 152-53 (3d Cir. 1999) (quoting Burlington Indus., Inc. v. Ellereth, 534 U.S. 742, 761, (1998)).  However, Title VII "do[es] not provide relief for unpleasantness that may be encountered in the work place.  Rather [it] provide[s] a remedy only if discrimination seriously and tangibly altered the employee's ability to perform the job or impacted the employee's job benefits."  Walker v. Centocor Ortho Biootech, Inc., 558 Fed. App'x 216, 219 (3d. Cir. 2014) (citing Storey v. Burns Int'l Sec. Servs. 390 F.3d 760, 764 (3d Cir. 2004)).

In its opening brief, the School District summarized thirty-two acts that it believed Plaintiffs identified as adverse employment actions.[10]  School District Mem. in Supp. at 14-15

---

[10] The acts identified by the School District can be further summarized and consolidated as follows: (1) frequent schedule changes for the building (JA11-12, JA468-69, JA241-42);  (2) disproportionate covering of classes for absent teachers (JA12, JA359-61); (3) unbalanced distribution of prep periods throughout the week (JA358-59); (4) failure to support Plaintiffs' discipline of students (JA18-19, JA235, JA243-244, JA420); (5) "write-ups" for perceived misconduct (JA16-17, JA19, JA32, JA56, JA194, JA196-97, JA372, JA461); (6) negative mid-year classroom evaluations (JA30, JA252-53, JA338-39, JA373-74, JA424, JA471, JA483, JA2291-92, JA2295-98); (7) failure to input Act 48 (teacher continuing professional education) credits (JA25-26, JA386, JA479-480); (8) changes to  assigned classrooms (JA 236-37, JA376, JA379, JA467, JA469, JA523-524); (9) initial denial of permission to hold a Thanksgiving feast (JA470); (10) twice rescheduling a field trip and, on the second occasion, falsely

(ECF No. 141).  In its response to the School District's brief, Plaintiffs appear to identify seven

somewhat overlapping adverse employment actions, namely:

- "SDP's decision [to] permit Charles Ray to be the Principal at Mifflin without proper training or without, at minimum, a mentor";

- "the SDP decision to keep silent about the 'Bradley emails' and not inform the Plaintiffs";

- "requiring [Plaintiffs] to work under severe stress, anxiety, humiliation, loss of sense of security, fear, damage to reputation and the associated risks from the invasion of Plaintiffs' private, personal familial space and ultimately to cause harm";

- "the decision of SDP to permit Principals to establish or require teachers to attend a professional development program that has not been reviewed and approved by the administration for appropriate content and presentation";

- "requiring [Plaintiffs] to work in an unprofessional setting under severe stress and humiliation caused by accusations contained in the [Graybill] article";

- "requiring [Plaintiffs] to work in an unprofessional setting, under severe stress, anxiety and fear associated with receiving substandard ratings–and the absolute failure to provide any legitimate feedback or explanation so that the Plaintiffs had no idea what they had allegedly doen incorrectly or what to do to ensure they would not receive low ratings in the future"; and

- "requiring [Plaintiffs] to work in an unprofessional setting, under severe stress, anxiety, fear, humiliation, and [the] upset the Plaintiffs were subjected to."

Pls. Mem. in Opp'n at 24-27 (ECF No. 150-1).  The School District interpreted Plaintiffs'

opposition brief slightly differently, identifying five adverse employment actions that it believed

Plaintiffs had not conceded:

- the School District allowed Ray to become a principal and did not inform Plaintiffs about Bradley;

- the School District did not formally approve Ray's distribution of the Graybill article;

- someone who had superior authority over Ray directed Ray to issue lo marks on teacher observations;

- Ray made negative criticisms about Plaintiffs; and

---

informing students that one of the Plaintiffs was to blame for the cancellation (JA235, JA255-56, JA369, JA469-70, JA520); (11) failing to provide certain testing materials in a timely fashion (JA250); (12) initial assignment to a grade level for which they were not certified (JA375-78); (13) permitting the SBTL to enter a classroom unannounced and make comments about the classroom and teaching style (JA274); (14) failure to provide supplies and textbooks (JA239-41, JA300); and (15) failure to provide a teacher's desk and delay in authorization to take a desk from another room (JA364-65, JA371, JA409-10).

- Ray gave two African American teachers (Ishmael and Highsmith) preferential treatment with respect to 'free time' and compensation for prep time.

School District Reply Mem. at 7 (ECF No.157).  In Plaintiffs' surreply, Plaintiffs claim that they have "identified well over twenty different adverse employment actions taken throughout the 2008-2009 school year." Pls. Surreply Mem. at 11 (ECF No 159).   Rather than clearly set forth the "well over twenty" adverse employment actions Plaintiffs allegedly suffered, Plaintiffs include two footnotes to refer the Court back to "Section C" of their opposition brief, and provide unannotated lists referencing 72 paragraphs within Plaintiffs' Statement of Disputed Facts and over 100 pages from the Joint Appendix. Id. at 11 n.7-8.  Though Plaintiffs have been less than clear in detailing the claimed adverse employment actions, at the summary judgment stage we must construe the record in the light most favorable to the non-moving party.  See Zimmerman, 706 F.3d at 176.

While Plaintiffs' claim that they were subjected to an ever-evolving laundry list of less than desirable working conditions, I cannot agree that a reasonable jury could find that these actions or inactions, whether considered individually or collectively, constitute a legally sufficient  adverse employment action to justify relief under Title VII.  Plaintiffs seek redress for conduct that courts in the Third Circuit have sometimes described as "petty slights and workplace grievances," rather than actionable adverse employment actions.  See Ugorji v. New Jersey Environmental Infrastructure Trust, 2012 WL 1964525, at *5 n.8 (D.N.J. May 4, 2012) (no adverse employment action when Plaintiff was (1) ordered to remove a bag Plaintiff had used for years, (2) followed and yelled at, (3) monitored while in Plaintiff's office and at copy machines, and (4) denied an ergonomically sufficient workstation); Pagan v. Holder, 741 F. Supp.2d 687, 696 (D.N.J. 2010) (no adverse employment action when Plaintiff complained of (1) being denied requests for days of annual leave, (2) enduring a three week delay in repairing an

air conditioner, (3) having to work alone in the gymnasium, (4) having personal belongings boxed up and removed from her former work location, (5) receiving supervisory reports for her failure to comply with work policies, and (6) not being dismissed from work during a snow storm).  Other courts in the Third Circuit have found that similar conduct did not amount to adverse employment actions, regardless of how the court characterized the conduct.  See Clayton v. Pennsylvania Dept. of Welfare, 304 F. App'x 104, 108 (3d Cir. 2008) (no adverse employment action for Plaintiff who (1) was threatened with furlough, (2) had his employee mailbox moved to another building, (3)  had a desk removed from his office, (4) had his office assignment changed multiple times; (5) was denied a bonus that he was ineligible for; and (6) received cash payments later than he should have received them); Blake v. Penn State Univ. Greater Alleheny Campus, 2011 WL 841374, at *9-10 (W.D. Pa. March 8, 2011) (no adverse employment action when Plaintiff complained of being (1) subjected to monthly disciplinary conferences in the absence of rule violations, (2) berated in front of co-workers on minor or insignificant grounds, (3) burdened with harsh work assignments, and (4) overly monitored at work).

        (i)     *Ray's "Disciplinary" Actions*

Plaintiffs point to Ray's mid-year classroom observations of them as adverse employment actions.  While Plaintiffs clearly would have preferred more favorable ratings on these evaluations, there is no evidence in the record that the "low" scores that they received from Ray impacted Plaintiffs' compensation, terms, conditions, or privileges of employment.  See, e.g., Mieczkowski, 414 F. App'x at 447 ("[R]eprimands that do not 'effect a material change in the terms or conditions of . . . employment' cannot be considered adverse employment actions.") (citing Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001)).  All four plaintiffs were rated

"satisfactory" (as opposed to "unsatisfactory") for the 2008-2009 school year, so they cannot claim that Ray's observations damaged them in that regard.  JA30, JA257, JA374, JA3080, JA2299.  To the extent that Plaintiffs argue that these observations have a lasting negative impact on their careers, Plaintiffs could prevent that scenario by simply removing those evaluations from their files.  JA2108.  Indeed, Plaintiff Boyd already removed such material from her file, and Plaintiff Yarnall, the only plaintiff whose file still contains a classroom evaluation from Ray, could remove that material as well.  JA17, JA33, JA56; JA406, JA417-18.  The Third Circuit has held that documents of a similarly temporary nature could not amount to adverse employment actions.  See Weston, 251 F.3d at 431 ("Additionally, the reprimands were of a temporary nature.  Because they were not permanently affixed to [plaintiff]'s employment file, we cannot see how they changed or altered [plaintiff's] employment status in any way.").  Accordingly, Ray's mid-year classroom observations of Plaintiffs do not amount to an adverse employment action.  For the same reasons, Ray's verbal reprimand of Marenbach and the "write-ups" of Marenbach and Boyd do not constitute adverse employment actions under Title VII.

(ii)     *Undermining Plaintiffs' Authority*

Plaintiffs also cite as adverse employment actions several instances where Ray allegedly undermined Plaintiffs' authority in front of students and parents.  Specifically, Plaintiffs cite Ray's failure to support Plaintiffs with student discipline, Ray's criticism of Plaintiffs in front of students and/or parents, and Ray's statement in front of students that a field trip was cancelled because Yarnall failed to timely submit the required paperwork.  JA18-19, JA235, JA243-44, JA255-56, JA369, JA420, JA469-70, JA520.  Again, while Plaintiffs may disagree with Ray's decisions or handling of these matters, there is nothing in the record that would support a conclusion that these grievances amount to adverse employment actions.  See Ferguson v.

Deptford Twp., 2008 WL 5401630, at *5 (D.N.J. Dec. 22, 2008) ("Allegations of intense

scrutiny, overly critical supervision, unnecessary reprimands or derogatory comments do not

constitute an adverse employment action.") (citing Buffa v. New Jersey State Dep't of Judiciary,

56 F. App'x 571, 576 (3d Cir. 2003)).  I view Plaintiffs' allegation that Ishmael entered the

classroom unannounced to make comments about the classroom and teaching style in a similar

light.  Any "intense scrutiny" or "overly critical supervision" Plaintiffs suffered at the hand of

Ishmael carries even less weight as an adverse employment action, as Ishmael was a fellow

teacher and not a supervisor or member of the administration.  JA270, JA274.  Accordingly,

Ishmael's classroom interruption and comments are not an adverse employment action.

(iii)    *Classroom Assignments*

Plaintiffs' claim that being forced to move their classrooms prior to the 2008-2009 school

year is an adverse employment action.  While I can understand why Plaintiffs would have

preferred not to move their classrooms, I do not agree that requiring them to move from one

functional classroom to another functional classroom prior to the start of the school year is an

adverse employment action.  The Third Circuit has agreed that requiring an employee to move

their office is not an adverse employment action.  See Clayton, 304 F. App'x at 108; Langley v.

Merck & Co., Inc., 186 F. App'x 258, 260 (3d Cir. 2006) (moving an employee's office, among

other complaints, was not an adverse employment action).

(iv)    *Marenbach's Grade Assignment*

Ray initially assigned Marenbach to teach 7th grade and 8th grade – grade levels that

Marenbach was not certified to teach.  JA375-78.  However, Marenbach quickly raised this issue

and, prior to the start of classes, Marenbach was reassigned to teach 6th grade – a grade level that

she was certified to teach.  Id.  I do not view Marenbach's temporary assignment to 7th and 8th

grade, or her ultimate assignment to 6th grade, as an adverse employment action.  The temporary

assignment to a position that Marenbach was not certified to teach was just that – temporary.

Marenbach was reassigned before classes began, and she did not actually teach any students that

she was not certified to teach.  Marenbach's ultimate assignment to 6th grade was something that

she was certified to undertake, and it is seemingly the type of grade assignment that is

encouraged under her union's contract with the School District.  JA2122.  Other courts within

the Third Circuit have found that similar grade assignment changes do not constitute an adverse

employment action.  Walter v. Cumberland Valley Sch. Dist., 2010 WL 2404367, at *5 (M.D.

Pa. June 10, 2010) (involuntary transfer from an 11th and 12th grade position at a high school to

an 8th grade position at a middle school was not an adverse employment action for purposes of

the Americans with Disabilities Act).

(v)   <em>Scheduling Problems</em>

Plaintiffs allege that Ray failed to provide a daily schedule for the school and that Ray

changed the building schedule frequently and without notice.  JA11-12, JA468-69, JA241-42.

While such activities may be evidence of a management style that failed to maximize efficiency

or communicate effectively, these changes had no impact on the daily hours that Plaintiffs were

expected to report for duty.  Furthermore, there is nothing in the record to suggest that Ray's

actions and inactions amount to anything more than a "trivial" or "minor change" in Plaintiffs'

working conditions.  See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 788 (3d Cir.

1998).  Accordingly, I find the that failure to provide a daily schedule for the school and the

frequent changes to the building schedule without notice do not amount to adverse employment actions.[11]

Plaintiffs also point to two scheduling problems with preparation periods: (1) certain teachers did not have daily prep periods, but instead had certain days with no prep periods and other days with multiple prep periods (JA358-59); and (2) certain teachers were forced to cover absent teachers more than others (JA12, JA359-61), resulting in certain teachers losing more prep periods than other teachers.  Marenbach apparently would have preferred daily prep sessions, as opposed to having two days with two prep sessions and two days with no prep sessions.  JA358-59.  The union contract, however, requires a minimum amount of weekly preparation time, not daily preparation time.  JA2120.  The contract even acknowledges the possibility that preparation time will not be allocated on a daily basis.  Id.  Marenbach's initial schedule satisfied the contractual requirement for the amount of weekly preparation time, and her schedule was ultimately changed to include daily preparation time.  JA359.  Accordingly, the failure to provide daily preparation sessions is not an adverse employment action.

The "lost preps" also do not amount to an adverse employment action.  These "lost preps" occur when other teachers in the building are unexpectedly unavailable to fulfill their duties for a wide variety of reasons.  These partial or complete absences are a part of life in a school environment, as is the fact that the remaining teachers may have to lose their prep period to cover the absent or unavailable teacher's assignment.  The union contract addresses the ways in which teachers can be compensated for any "lost preps," and each of the Plaintiffs was appropriately compensated for her "lost preps" during the 2008-2009 school year.  JA2120. Yarnall, Marenbach, Boyd, and Ciccimaro had, respectively, a total of 9, 11, 13, and 13 "lost

_____

[11] Even if such actions were adverse employment actions, because they were practices that impacted the entire school and all of its teachers, Plaintiffs' cannot demonstrate that the School District was treating some employees less favorably than others in this respect.

preps" at the end of the year.  JA2326-29.  Given that these "lost preps" were an expected occurrence, something for which Plaintiffs were appropriately compensated, and amounted to approximately ten hours of time per Plaintiff throughout the entire school year, they do not constitute an adverse employment action.  See Morris v. United Steel Workers of Am. Local 4889, 2010 WL 933807, at *11 (E.D. Pa. March 19, 2010) (no adverse employment action when plaintiff was appropriately compensated for all overtime, there was no violation of the labor contract, and the labor contract contemplated that overtime could be required by management).

(vi)    *Furniture*

The failure to provide Marenbach with a teacher's desk for a portion of the school year and the failure to provide an additional table for her classroom are not adverse employment actions.  See, e.g., Clayton, 304 F. App'x at 108.  The record demonstrates that Marenbach was able to effectively teach and carry out her other duties without a teachers desk, and that although the lack of a teacher's desk was not ideal, the resulting inconvenience did not rise to the level of an adverse employment action.  JA364-65, JA414-15.  Similarly, Ray's denial of Marenbach's request to remove a table from Ishmael's classroom is not an adverse employment action.

(vii)    *Special Events*

Yarnall points to Ray's initial refusal to allow her to organize a "Thanksgiving feast" for her classroom as an adverse employment action.  Any inconvenience Yarnall experienced as a result of Ray's initial refusal was not only minor, but was also ameliorated by the fact that Yarnall was ultimately permitted to hold the event.  JA470.  Ray's temporary denial of permission for the "Thanksgiving feast" is not an adverse employment action.

The rescheduling of a field trip to see The Tale of Despereaux does not amount to an adverse employment action for Plaintiffs.  The rescheduling of the field trip may have

14

engendered disappointment for students and inconvenience for Plaintiffs, but there is nothing in the record to suggest that this incident was substantial enough to qualify as an adverse employment action. (JA369).

(viii)    *School Supplies*

Boyd and Ciccimaro did not have a sufficient number of math text books for their students for a substantial portion of the school year.  As a result, Boyd and Ciccimaro copied relevant portions of the textbooks for their students and taught using the copied versions of the texts. (JA240-41).  Boyd and Ciccimaro were able to work around and adapt to the shortage of textbooks, and the resulting inconvenience suffered by Boyd and Ciccimaro is not sufficient to transform this lack of supplies into an adverse employment action.  Id.

Ciccimaro claims that Ray failed to provide the TerraNova test to Ciccimaro and Boyd in a timely fashion, foreclosing any chance for the tests to be administered during the period established by the School District.  JA249-50.  Ciccimaro believes that the failure to administer the test during the testing window reflected poorly on her and Boyd, and the resulting stress from this incident and Ray's related reprimand transformed this incident into an adverse employment action.  JA250-51.  Ciccimaro admits, however, that no formal discipline resulted.  JA251.  Accordingly, what remains is Ciccimaro's belief that she suffered some sort of unspecified reputational harm, endured unnecessary degradation, and was unnerved.  Id.  This is not sufficient to constitute an adverse employment action.

(ix)    *Act 48 Credits*

Ray failed to input Act 48 credits for Plaintiffs and other teachers at Mifflin.  JA25-26, JA386.  Act 48 credits are continuing professional education credits required by the Commonwealth of Pennsylvania for all public school teachers in order to maintain their

15

certification.  Ultimately, Plaintiffs' Act 48 credits were recorded with the Commonwealth's

computer system by West Region Interim Superintendent Diane Hathaway.  JA479.  Plaintiffs

experienced no adverse employment action as a result of the delay in inputting their Act 48

credits, as they experienced no revocation or suspension of their certification, and the only

problem it created was that Plaintiffs could not see an accurate accounting of their credits for a

few months.  JA26, JA386, JA479.

(x)     <em>Stress-Inducing Activities</em>

As discussed above, Plaintiffs claim that there were subjected to, <u>inter alia</u>, stress, an

unprofessional setting, anxiety, humiliation, and fear due to certain actions taken by Ray and the

School District.  Plaintiffs opposition brief points to three actions that induced this stress and

related emotions: (1) Ray's invasion of Plaintiffs' privacy, (2) Ray's distribution of the Graybill

article, and (3) receiving substandard ratings without explanation or feedback. Pls. Mem. in

Opp'n at 25-27.  Experiencing stress and related emotions does not amount to an actionable

adverse employment action.  <u>See</u> <u>Duffy v. Paper Magic Group, Inc.</u>, 265 F.3d 163, 168 (3d Cir.

2001) ("[A]lthouh the above allegations indicated that [Plaintiff] experienced stress and

discomfort on the job, [Plaintiff] did not provide sufficient evidence that [Plaintiff] was

constructively discharged or otherwise suffered an adverse employment action.").  As discussed

above, Ray's mid-year classroom evaluations were not adverse employment actions.  Plaintiffs

cannot point to anything in the record about Ray's distribution of the Graybill article that

impacted the compensation, terms, conditions, or privileges of their employment, and the

inducement of stress caused by reading the article is not enough.  Similarly, nothing about Ray's

alleged interactions with Bradley and Bradley's alleged activities impacted the compensation,

terms, conditions, or privileges of Plaintiffs' employment.  Plaintiffs do not allege that they were

16

constructively discharged as a result of Bradley's activities, and Plaintiffs' after-the-fact

reactions to learning about Bradley's alleged activity is not an adverse employment action for

purposes of establishing a prima facie case of discrimination.

(xi)   <em>School District Decisions</em>

Plaintiffs also cite certain School District decisions as adverse employment actions,

namely: (1) the decision to permit Ray to be principal without proper training and/or a mentor,

(2) the decision not to inform Plaintiffs about the "Bradley emails," and (3) the decision to

permit principals to require teachers to attend professional development programming that has

not been reviewed or approved.  Plaintiffs have pointed to nothing in the record and have offered

no clear legal theory to support their claim that the School District's decisions with respect to

Ray's hiring, training, and mentorship were adverse employment actions as to Plaintiffs.

Similarly, Plaintiffs offer no legal authority or persuasive argument to support their claim that

the School District's decision to allow principals to implement professional development

programming was an adverse employment action as to Plaintiffs.  Lastly, Plaintiffs have not

articulated how the School District failed to respond properly to the allegations made by Bradley

or how such failure constituted an adverse employment action.  The record demonstrates the

following:

- The School District learned about some of Bradley's allegations on May 1, 2009, when Bradley forwarded the School District an email he received from Ray.  JA2341.
- The email suggests that Ray may have improperly given Bradley the email addresses for Boyd, Yarnall, and Marenbach, but suggests little else.  Id.
- On May 12, 2009, the School District held a conference involving Ray and School District administrators regarding Ray's alleged distribution of personal information of Mifflin teachers.  JA1258-60.
- On May 15, 2009, the School District removed Ray from Mifflin and he never returned.  JA2961.

- On June 1, 2009, Hathaway recommended that Ray be dismissed from employment with the School District.  JA2342-48.
- Ray resigned on June 30, 2009.  JA1277.

The record is clear that the School District responded quickly to Bradley's allegations and took meaningful steps to address the situation.  Furthermore, nothing about the School District's response seriously and tangibly altered Plaintiffs' ability to perform their jobs, impacted their job benefits, or resulted in a significant change to their employment status.

Because no reasonable fact finder could conclude that Plaintiffs experienced an adverse employment action, Plaintiffs have failed to make out a prima facie case for racial discrimination disparate treatment.  The School District's motion for summary judgment on this portion of the Title VII claim will be granted.

2.    Title VII Hostile Work Environment

To establish a hostile work environment claim against an employer, a plaintiff must prove the following: (1) the employee suffered intentional discrimination because of their race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability.  Mandel v. M & Q Packaging Corp., 706 F.3d, 157 167 (3d Cir. 2013).  "The first four elements establish a hostile work environment and the fifth element determines employer liability." Id. (citing Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Upon a review of the entire record, and after considering all of the circumstances, I cannot agree that the School District is entitled to summary judgment on Plaintiffs' Title VII

hostile work environment claim.[12]   In light of the various incidents raised by Plaintiffs in support of their disparate treatment discrimination claim, as well as the additional incidents that Plaintiffs cite in support of their hostile work environment claim, and construing all evidence in the light most favorable to the Plaintiffs, a reasonable jury could find for Plaintiffs on their hostile work environment claim.  Accordingly, the School District's motion for summary judgment on this portion of the Title VII claim will be denied.

**B.    Count II - § 1983 Equal Protection of the Law**

Section 1983 provides, in relevant part: "Every person who, under color of [law] . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.  In essence, § 1983 "provides a federal cause of action for the violation of a federal right." Dique v. N.J. State Police, 603 F.3d 181, 185 (3d Cir. 2010).  Plaintiffs allege that Ray, Ishmael, and Gilbert violated Plaintiffs' constitutional right to equal protection of the law and "the right to be free from discrimination, the right to be free from disparate treatment, the right to be free from a hostile work environment and the right to a good reputation."  Third Cons. Am. Compl. at ¶ 54.  Ishmael and Gilbert move for summary judgment in their favor on this count; Ray does not.

**1.    Gilbert**

Gilbert argues that the § 1983 claim against him is barred by the statute of limitations.  I agree.

---

[12] Applying the Third Circuit's recent decision in Hildebrand v. Allegheny County, 757 F.3d 99 (3d Cir. 2014), I find that the EEOC Intake Questionnaires submitted by Plaintiffs Boyd, Ciccimaro, and Yarnall satisfy the applicable requirements for filing a charge of discrimination with the EEOC.  While the sufficiency of Marenbach's EEOC Intake Questionnaire is much less clear, genuine issues of material fact remain unresolved.  Accordingly, summary judgment as to this portion of the claim is not appropriate.

Pennsylvania law determines the statute of limitations for Plaintiffs' § 1983 claim against Gilbert.  Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009) (citing Wallace v. Kato, 549 U.S. 384, 387 (2007)).  The applicable period is two years. 42 Pa. Cons. Stat. § 5524; Kost v. Kozakiewicz, 1 F.3d 176, 190 (3d Cir. 1993).  Plaintiffs filed their initial complaints in this action on May 10, 2011.  Accordingly, Plaintiffs' § 1983 claims against Gilbert must have accrued on or after May 10, 2009.[13]  The record is clear that Gilbert's last day of employment with the School District, and thus the last day he acted under color of state law with respect to Plaintiffs, was December 29, 2008.  Facts at ¶¶ 2, 4; Gilbert's Answer to Third Cons. Am. Compl. at. ¶ 5 (ECF No. 177).  This is over five months before Plaintiffs' § 1983 claim against Gilbert must have accrued.  Accordingly, Plaintiffs' § 1983 claim against Gilbert is barred by the statute of limitations.  Gilbert's motion for summary judgment on Count II will be granted.

      2.   Ishmael

Ishmael argues that summary judgment must be entered in her favor on the § 1983 claim because at no time was Ishmael a state actor who was acting under the color of state law.  I agree.

---

[13] "Federal law which governs the accrual of section 1983 claims establishes that the limitations period begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action."  Genty v. Resolution Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991).  However, "[t]he cause of action accrues even though the full extent of the injury is not then known or predictable. Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief."  Wallace, 549 U.S. at 391 (internal quotation marks and citations omitted).  Plaintiffs' attempts to delay the start of the statute of limitations period for their claim against Gilbert until May 15, 2009 are unavailing and entirely unsupported by the record.  There is nothing that would support a finding that Plaintiffs only discovered Gilbert's alleged role in interfering with their "right to be free from discrimination, the right to be free from disparate treatment, the right to be free from a hostile work environment and the right to a good reputation" until after Bradley emailed Plaintiffs on May 15, 2009.

"A finding of liability under 42 U.S.C. § 1983 requires that the defendant . . . have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Bonenberger v. Plymouth Twp., 132 F.3d 20, 23 (3d Cir. 1997) (internal quotations and citations omitted). "Generally, in order to act under the color of state law, the wrongdoer must be in a supervisory position in relation to the Plaintiff." Zelinski v. Pennsylvania State Police, 108 F. App'x 700, 703 (3d Cir. 2004) (citing Bonenberger, 130 F.3d at 23-24). Here, neither Plaintiffs' Third Consolidated Amended Complaint, nor Plaintiffs' opposition to Ishmael's motion even attempt to establish that Ishmael was actually in a supervisory position in relation to Plaintiffs. Rather, Plaintiffs' allege that Ishmael "behaved as if she was a supervisor of Plaintiffs." Third Cons. Am. Compl. at ¶ 51. Ishmael acting "as if" does not equal Ishmael acting under color of state law. Any notion that Ishmael acted under color of state law is belied by Ciccimaro's deposition testimony about Ishmael. JA270 ("[The SBTL] is a PFT co-teacher who, and in no way is administrative, not quasi or in any other way."); JA274 ("[Ishmael is] PFT, I'm PFT. She can't tell me what to do[.]"). While the Third Circuit has held that "[t]here is simply no plausible justification for distinguishing between abuse of state authority by one who holds the formal title of supervisor, on the one hand, and abuse of state authority by one who bears no such title but whose regular duties nonetheless include a virtually identical supervisory role," Bonenberger, 132 F.3d at 23, there is nothing in the record to support a finding that Ishmael's regular duties included a virtually identical supervisory role.[14] Accordingly, Ishmael's motion for summary judgment on Count II will be granted.

---

[14] The record clearly establishes the following: (1) Ishmael was a fellow teacher at Mifflin; (2) Ishmael was a member of the same union as Plaintiffs (previously serving as the "building rep" for the union bargaining unit); (3) Ishmael's role as SBTL did not grant her any authority over Plaintiffs or other teachers at Mifflin; (4) Ishmael could not discipline, observe, evaluate, or terminate Plaintiffs; and (5) Ishmael's infrequent designation as Teacher In Charge was on as an as-needed basis, for a short duration,

### C.    Count IV – Race Discrimination in Violation of the PHRA

The PHRA requires a plaintiff to file a complaint with the PHRC within 180 days of the alleged discriminatory act in order to preserve their claim.  See Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997) (citing 43 Pa. Cons. Stat. §§ 959(a), 962).  Defendants argue summary judgment in their favor is warranted on Plaintiffs' PHRA claims because, inter alia, Plaintiffs failed to file an administrative complaint with the PHRC within the required time period.  I agree.

Defendants raised this argument at the motion to dismiss stage.  At that time, without the benefit of discovery and only relying on the pleadings, I ruled that "the doctrine of equitable tolling should apply for the period between the time that the Charge Questionnaire was filed with the EEOC and the time that the formal charge of discrimination was dual filed with the EEOC and the PHRC."  Mot. Dismiss Mem. at 5-6 (ECF No. 70).  That decision was based on the Plaintiffs' representations that they "did not hear from the EEOC for nearly 18 months after filing their EEOC Questionnaire, despite attempts to contact the EEOC."  Id. at 6.  Also important to that decision was Plaintiffs' assertion that they were unrepresented at the time their administrative complaint would have been due.  Id.  Defendants filed a motion for reconsideration on this point, arguing that Plaintiffs were represented during the time the claims "sat" at the EEOC.  While I denied the motion for reconsideration on that point, I noted my doubts that Plaintiffs were indeed unrepresented, and permitted the Defendants to re-raise this argument at that close of evidence.  Having reviewed the entire record before the Court on the cross motions for summary judgment, it is apparent that my initial ruling applying equitable tolling cannot be sustained.

was not exclusively given to her, and made her responsible for the building but not for supervising Plaintiffs.  JA59-60, JA297-98, JA411, JA522.

Equitable tolling should be applied sparingly, and the statutory procedural requirements established by legislatures "are not to be disregarded by courts out of a vague sympathy for particular litigants." Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984).  The Third Circuit has "exercised caution in using" equitable tolling, and has "approach[ed] the doctrine warily, so as to guard against possible misuse." Seitzinger v. Reading Hosp. and Med. Ctr., 165 F.3d 236, 240 (3d Cir. 1999).  Generally, equitable tolling is appropriate if "(1) the defendant has actively misled the plaintiff, (2) if the plaintiff has 'in some extraordinary way' been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum." Kocian v. Getty Ref. & Mktg. Co., 707 F.2d 748, 753 (3d Cir. 1983).

### 1.   EEOC Interactions

Plaintiffs' version of their EEOC interactions is summarized below.  On September 19, 2009, Plaintiff Marenbach signed and mailed a completed EEOC Intake Questionnaire to the Philadelphia Regional Office of the EEOC.  JA2867.  On September 20, 2009, Plaintiffs Boyd, Ciccimaro, and Yarnall faxed signed and completed EEOC Intake Questionnaires to the Philadelphia Regional Office of the EEOC.  JA2261-66, JA2277-82, JA2284-89.   Thereafter, Plaintiffs Boyd and Yarnall "called [the Philadelphia Regional Office of the EEOC] weekly" for updates as to the status of their respective cases.  JA2804.  During some of those weekly calls to the EEOC, Plaintiffs Boyd and Yarnall were informed that the EEOC would contact them.  Id. Having received no written communication from the EEOC, Plaintiffs collectively visited the Philadelphia Office of the EEOC on April 21, 2011, over 19 months after they faxed or mailed their Intake Questionnaires to the EEOC.  Id.  Plaintiffs requested a group interview at the EEOC, a request the EEOC denied.  Id.  An EEOC investigator prepared a complaint for Boyd,

Ciccimaro, and Yarnall. Pls. Statement of Disputed Facts at 23 (ECF No. 150).  An EEOC

investigator did not prepare a complaint for Marenbach.  Id.  The EEOC complaints prepared and

filed in April 2011, were cross-filed with the PHRC.  JA2505, JA2511, JA2530, JA2544,

JA3012, JA3018.  Plaintiffs argue that with this record of inaction and inexcusable delay on the

part of the EEOC, it is appropriate for the Court to apply equitable tolling to the period between

the submission of the EEOC Intake Questionnaires and the date the formal charges were filed

with the PHRC.

   The record now before the Court tells a much different story.  As an initial matter, while

Plaintiff Marenbach has raised a triable issue as to whether she filed her EEOC Intake

Questionnaire on or about September 19, 2009, there is no dispute that the EEOC has no record

of receiving such a complaint.  Where the EEOC has no record of receiving an Intake

Questionnaire, and the purported filer made no efforts to document that the Questionnaire was

filed or follow up on the status of that Questionnaire for over 19 months, I cannot agree that the

filer has been prevented from asserting her rights in some extraordinary way.  The EEOC did

not, as the Court was led to believe at the motion to dismiss stage, sit on Marenbach's Intake

Questionnaire for 19 months without taking any action.  Rather, the EEOC took no action

because it had no document requesting that it take any action on Marenbach's behalf.

   The record with respect to Boyd, Ciccimaro, and Yarnall also tells a much different story.

While the record indicates that the EEOC did receive their Intake Questionnaires, the record also

indicates that the EEOC did not sit on these documents for 19 months.  Rather, the record makes

clear that the EEOC wrote and sent letters to Boyd and Ciccimaro on March 3, 2010, and April

5, 2010, respectively, informing them that the information they provided was not sufficient for

filing a charge of discrimination.  JA2259-60, JA2275-76.  The letters stated that Boyd and

Ciccimaro could either pursue action with the Philadelphia Commission on Human Relations or visit the EEOC for an interview, but that if they did not visit or otherwise contact the EEOC, there would be no further action on their file by the agency.  Id.  The EEOC record does not contain a copy of any such letter to Yarnall.  JA2496-2517.  On June 18, 2010, the EEOC closed its files for Boyd and Ciccimaro for failing to respond to the EEOC's invitation to continue the intake process.  JA2256-57, JA2272-73.  Yarnall's EEOC file contains a similar note, reflecting that her EEOC file was closed on June 22, 2010, for failing to continue with the intake process.  JA2283.  Plaintiffs' attempt to bolster their equitable tolling argument by blaming their inaction on the bad advice they received from the EEOC over the telephone is unavailing.  See Robinson v. Dalton, 107 F.3d 1018, 1023 (3d Cir. 1997) ("should a plaintiff . . . be able to circumvent exhaustion requirements by simply asserting s/he was given erroneous telephone advice from an agency employee, equitable toling would be converted from a remedy available only sparingly and in extraordinary situations into one that can be readily invoked by those who have missed carefully drawn deadlines").  At this stage, and with the benefit of these additional details, I cannot conclude that the EEOC prevented Plaintiffs from asserting their rights in some "extraordinary way."

> 2.   Plaintiffs' Relationship with Counsel

"[A]n implied attorney/client relationship will be found if 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him."  Atkinson v. Haug, 622 A.2d 983, 986 (Pa. Super. Ct. 1993).

My initial belief that Plaintiffs were unrepresented while their claims "sat" at the EEOC is no longer supported by the record.  Plaintiffs continue to maintain that the attorney-client relationship with their current counsel of record did not commence until April or May 2011, and that everything prior to that time was merely investigatory.  I cannot agree.  The following undisputed facts indicate that Plaintiffs were represented by counsel since 2009, or, at the very least, that Plaintiffs were not typical <u>pro se</u> petitioners who were forced to operate without any legal guidance or resources at their disposal:

- <u>Mid-May 2009</u>: Plaintiffs met with Attorney Hendrick "to ask what we should do." During that meeting, Attorney Hendrick provided advice to Plaintiffs.  JA504.

- <u>May 29, 2009</u>: Attorney Hendrick and Attorney Heenan called the School District's Inspector General's Office on behalf of all four Plaintiffs, and said that Attorney Hendrick and Attorney Heenan would be in touch with the Inspector General's Office following further discussion with Plaintiffs.  JA2254.

- <u>June 12, 2009</u>: Attorney Hendrick sent an open records request to the School District seeking video footage from Mifflin on March 18, 2009, the date of an alleged altercation involving Ishmael.  JA2255.

- <u>July 31, 2009</u>: Boyd sent a six-page facsimile to Attorney Hendrick, seemingly for the purpose of obtaining legal advice related to the claims now at issue in this litigation.[15]

- <u>May through September 2009</u>: Plaintiffs communicated with Attorney Hendrick "at various times in May through September 2009."  JA117, JA349-50, JA458, JA504, JA659-60.

- <u>Mid-September 2009</u>: Boyd, Ciccimaro, and Yarnall each identified Attorney Hendrick, Attorney Heenan, and Attorney Romney on their EEOC Intake Questionnaires as

---

[15]     Plaintiffs refused to produce this document to Defendants, claiming that the document is privileged.  During oral argument on the summary judgment motions, Plaintiffs agreed to provide this document to the Court for an <u>in camera</u> review.  Attorney Hendrick faxed the document to chambers on August 21, 2014 (ECF No. 173).  In order to preserve the existing claim of privilege, the document has been filed under seal (ECF No. 175) and I will not describe its contents any further. I have no doubt, however, that this document is consistent with an active attorney-client relationship.

Plaintiffs' refusal to produce this document on privilege grounds is evidence, in and of itself, that an attorney-client relationship existed as early as 2009.  Attempting to protect this communication under a claim of attorney-client privilege, while at the same time arguing for equitable tolling because Plaintiffs were unrepresented, strikes this Court as the very sort of "sword and shield" use of the privilege that the Third Circuit does not permit.  <u>See</u> <u>In re Chevron Corp.</u>, 650 F.3d 276, 289 n.17 (3d Cir. 2011); <u>see also</u> <u>U.S. v. Bilzerian</u>, 926 F.2d 1285 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword.").

individuals from who that had "sought help about this situation."  JA2261-66, JA2277-82, JA2284-89.

- Prior to April 2011: Attorney Hendrick placed a notation in her "tickler" file regarding Plaintiffs claims in order to remind her and Plaintiffs that the statute of limitations for Plaintiffs claims would expire in May 2011. Pls. Mem. in Supp. at 4 (ECF No. 144).

In light of this record, I am satisfied that Plaintiffs entered into an attorney-client relationship with their current counsel in 2009, not 2011.  Accordingly, it would be inappropriate to apply equitable tolling under these facts.  See Kocian v. Getty Refining & Marketing Co., 707 F.2d 748, 755 (3d Cir. 1983) (finding equitable tolling inapplicable where the plaintiffs were represented by counsel).  Even if Plaintiffs did not squarely fall within the definition of "represented" during that two-year period, the number and significance of their interactions with Attorney Hendrick (and others) demonstrates that equitable tolling should not apply.  See Meyer v. Riegel Prods. Corp., 720 F.2d 303, 308-09 (3d Cir. 1983) ("[A] plaintiff who has consulted with an attorney about a potential discrimination claim will not get away with complaining that he failed to understand the requirements and implications of the statute."); see also Reifinger v. Nuclear Research Corp., 1992 WL 268347, at *2 (E.D. Pa. Dec. 4, 1992) (equitable tolling is inappropriate where the plaintiff has consulted with counsel during the statutory limitation period).

The complete record demonstrates that equitable tolling should not be applied to the period between the filing of Plaintiffs EEOC Intake Questionnaires and the filing of their administrative charges with the PHRC.  Accordingly, Plaintiffs' 2011 filings with the PHRC were not timely, and Plaintiffs' cannot sustain their PHRA claim.  Defendants' motions for summary judgment on Count IV will be granted, and Plaintiffs' motion for partial summary judgment will be denied.

**D.    Count V – Title VII Hostile Work Environment and Retaliation**

In their Third Consolidated Amended Complaint, Plaintiffs[16] have not crystalized their legal theories for relief under Count V.  Taking into consideration Plaintiffs' reference to Count V in the Third Consolidated Amended Complaint as encompassing "2012-2013 Title VII **Claims**" (emphasis added),  the description of Count V in the parties' so-ordered stipulation, dated January 17, 2014 (ECF No. 116) ("[Count V] will raise an additional claim of **discrimination and retaliation** under Title VII of the Civil Rights Act of 1964") (emphasis added), and the language of the operative complaint, I interpret Count V as alleging claims for: (1) race discrimination based on a hostile work environment; (2) "traditional" retaliation; and (3) retaliation based on a hostile work environment.  The School District's motion for summary judgment on each of the theories encompassed in Count V will be granted.

1.    Race Discrimination via Hostile Work Environment

The requisite elements for a prima facie case of race discrimination via a hostile work environment have already been set forth in Section III.A.2 and will not be repeated here.

Following a review of the Third Consolidated Amended Complaint and the record on summary judgment, it is clear that the Plaintiffs have identified no evidence from which a reasonable juror could conclude that any of the actions attributed to the School District were motivated in any way by race.  Indeed, it seems as though the only potentially racially-motivated activity during that time period was perpetrated by Ishmael.  However, Plaintiffs only point to one incident involving them during 2012 and 2013 that could possibly implicate race: Ishmael's statement that Ciccimaro was telling teachers on the first floor that Ishmael was a racist.  JA278-

---

[16] Plaintiff Marenbach voluntarily transferred out of Mifflin following the 2008-2009 school year. Accordingly, she cannot and does not join in the retaliation claims based on the 2012-2013 conduct.  Any use of "Plaintiffs" in this section only refers to Boyd, Ciccimaro, and Yarnall.

79, JA2350.  All of Ishmael's other conduct does not implicate race.[17]  "Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief."  Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006).  Accordingly, Plaintiffs are unable to establish that the alleged hostile work environment was the result of intentional discrimination on the basis of their race.

Assuming, arguendo, that all of Ishmael's conduct implicates race or reflects racial animus, this claim is nonetheless fatally flawed because the complained of conduct does not rise to the level of being "severe or pervasive."  Unlike what Plaintiffs have alleged and supported with respect to their 2008-2009 school year hostile work environment claim, the offending events here are nothing more than "petty slights, minor annoyances, and simple lack of good manners," which normally do not create an actionable Title VII violation.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  To the extent that the allegations regarding Ishmael's conduct are supported by the record, such conduct would merely run afoul of a general civility code, which Title VII is not intended to provide.  Onacle v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998).

Because Plaintiffs are unable to establish a prima facie case of racial discrimination based on hostile work environment during 2012 and 2013, the School District's motion for summary judgment on this claim will be granted.

---

[17] Plaintiffs point to the following allegedly offending conduct: (1) Ishmael yelled and wagged her finger at Yarnall regarding the Thanksgiving feast (JA 278, JA481); (2) Ishmael got upset when Yarnall brought a special education student to her room (JA481, JA497); (3) Ishmael wrote a letter to Ms. Mason, complaining about Yarnall's conduct (JA481-82, JA2351); (4) Ishmael would greet or otherwise engage other teachers but would not greet or engage Plaintiffs (JA46-47); (5) Ishmael said to a parent, within earshot of Boyd, "I'm back, I'm now upstairs in the penthouse" and at other times stated "Everyone missed me" (JA47, JA198); (6) Ishmael pulled out of a field trip a few days in advance, forcing Boyd to find a replacement class (JA47); (7) Ishmael wrote a letter to Mason complaining about Boyd's conduct (JA49, JA2352); (8) Ishmael harassed Ciccimaro through nonverbal communication, such as frowning or making an exaggerated smile (JA276-77); and (9) Ciccimaro overheard Ishmael confronting another teacher about that teacher's effectiveness (JA226-27).

2.    "Traditional" Retaliation

To establish a prima facie case of retaliation, Plaintiffs must demonstrate (1) that they engaged in a protected activity; (2) that they were subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse action.  Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).  What constitutes an adverse action for retaliation purposes is different than other Title VII discrimination actions.  Here, "for the harm to be actionable, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  St. John v. Potter, 2011 WL 780685 (E.D. Pa. Mar. 4, 2011) (quoting Burlington N., 548 U.S. at 68).  In addition, the causation requirement for retaliation purposes is different than other Title VII discrimination actions.  As the Supreme Court recently clarified, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . [t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013).

Plaintiffs appear to allege a traditional retaliation claim against the School District, based upon the School District's decision to permit Ishmael to return to work at Mifflin after she concluded her medical leave in April 2012.  Third Cons. Am. Compl. at ¶ 89.  Plaintiffs seemingly allege that this was the "materially adverse" action that forms the basis of their traditional retaliation claim, and that the School District "knew or should have known that Shirl Ishmael would continue the harassment and create a hostile work environment upon her return to

Mifflin school in April, 2012." Third Cons. Am. Compl. at ¶ 98.  Plaintiffs allege that the

decision to let Ishmael return to Mifflin was exacerbated by the following actions and inactions:

- the School District did not provide training to Ishmael prior to her return;
- the School District did not provide a reporting mechanism for discrimination and hostile work environment complaints or failed to instruct the Plaintiffs whether such reporting mechanism was available;
- the School District did not create a "non-retaliation policy" or failed to instruct Plaintiffs whether such a policy existed and how to invoke its protections;
- the School District did not provide Plaintiffs with any information on its actions regarding Ishmael;
- the School District did not train Ms. Mason (the Mifflin principal in 2012 and 2013) on how to address Ishmael's behaviors.

Third Cons. Am. Compl. at ¶¶ 99, 102.  Plaintiffs also allege that the School District "did

nothing to stop the racially charged behavior of Shirl Ishmael from April 2012 through the end of

the 2013 school year."  Id. at ¶ 100.

Plaintiffs repeatedly say that the above-described actions are materially adverse, but they

have not sufficiently demonstrated that the record supports the material adversity of these

allegations.[18]  More importantly, Plaintiffs have not cited any authority that supports their

position that these actions and inactions by the School District meet the "materially adverse"

requirement. Plaintiffs' initial response in opposition to the School District's motion for

summary judgment makes no suggestion the School District's actions or inactions would

dissuade a reasonable worker from making or supporting a charge of discrimination.  Pls. Mem.

in Opp'n at 31-33.  Plaintiffs' surreply also completely fails to address this point.  Pls. Surreply

Mem. at 20-21.  In the absence of any explanation and supporting authority, I cannot conclude

---

[18] In fact, it appears as though some of Plaintiffs' allegations are clearly contradicted by the record. JA31-32 (Boyd admitting at her deposition that she understood the School District had a policy prohibiting racial discrimination); JA281(Ciccimaro admitting at her deposition that she was aware the School District had a policy prohibiting discrimination and retaliation); JA501-02 (Yarnall admitting at her deposition that she was aware the School District had policy prohibiting discrimination and retaliation).

that the School District's decision to permit Ishmael to return to Mifflin was a materially adverse action with respect to Plaintiffs.  This is particularly true where: (1) Ishmael had a contractual right to return to the school at which she last taught before taking medical leave; (2) Ishmael returned in a standard teacher position, and not as an SBTL, and thus would have even less opportunity to interact with Plaintiffs than she had in 2008 and 2009; (3) the School District had existing policies in place prohibiting discrimination and retaliation that Plaintiffs could have invoked (JA31-32, JA281, JA501-02); and (4) the School District had numerous personnel to whom Plaintiffs could take their claims of discrimination and harassment.  Furthermore, the School District's alleged failure to "properly address" Plaintiffs' ongoing complaints of discrimination and harassment would not dissuade a reasonable worker from making or supporting an initial charge of discrimination where, as discussed above, Ishmael's conduct was not severe or pervasive.  Furthermore, the record demonstrates that Ms. Mason listened to Plaintiffs' complaints and addressed them in a manner consistent with other complaints of similar severity.  JA1528-33.  Treating Plaintiffs the same way that other teachers were treated does not rise to the level of "material adversity" required by Title VII.

Plaintiffs have also failed to meet the requisite but-for causation standard with respect to these claims.  Plaintiffs do not allege, and the record contains no evidence, that the School District deviated from its procedures or otherwise failed to fulfill an established duty to Plaintiffs that would allow a reasonably jury to conclude that the protected activity was the but-for cause of School District's actions or inactions.  Plaintiffs do not claim, for example, that after a lawsuit is filed the School District must train their employee defendants or reassigned them to ensure they never encounter the plaintiff(s).  In the absence of direct evidence of retaliatory intent, Plaintiffs may point to either (1) temporal proximity that is "unusually or unduly suggestive" of

retaliation, or (2) to some temporal proximity plus evidence of an intervening period of

antagonism.  Williams v. Phila. Hous. Auth. Police Dep't., 380 F.3d 751, 759-60 (3d Cir. 2004).

Here, neither scenario is present.  If calculated from the submission date of the EEOC Intake

Questionnaires, approximately 30 months passed between Plaintiffs' protected activity and

Ishmael's return to Mifflin.  If calculated from the filing of the complaints in this action,

approximately 11 months passed between Plaintiffs' protected activity and Ishmael's return.

This is not the type of temporal proximity that is "unusually or unduly suggestive."  See, e.g.,

McCann v. Asture, 293 F. App'x 848, 852 (3d Cir. 2008) (five months was not unusually or

unduly suggestive); McLaughlin v. Fisher, 277 F. App'x. 207, 218 (3d Cir. 2008) (less than a

month not suggestive of a retaliatory motive by itself); Walker v. Independence Blue Cross, 2005

WL 1266590, at *7-8 (E.D. Pa. May 27, 2005) (four months was not unusually or unduly

suggestive).  In addition, Plaintiffs have proffered no evidence to show an intervening period of

antagonism, either by the School District or Ishmael, to justify a finding of causation in light of

such attenuated temporal proximity.  The record is devoid of any hardships suffered by the

Plaintiffs from the time they engaged in their protected activity until Ishmael's return in April

2012.

Plaintiffs have failed to establish a prima facie case of "traditional" retaliation, as they

have neither established that they were subject to a materially adverse action, nor have they

established the requisite level of causation.  Accordingly, the School District's motion for

summary judgment on this portion of the claim will be granted.

### 3.   Retaliatory Hostile Work Environment

While Plaintiffs have failed to cite any action by the School District during 2012 and

2013 that would be sufficiently "materially adverse" or demonstrate the requisite level of

33

causation needed for a prima facie case of "traditional" retaliation, Plaintiffs also appear to be proceeding on a retaliatory hostile work environment theory.  In <u>Jensen v. Potter</u>, the Third Circuit established that in order to demonstrate a retaliatory hostile work environment, a plaintiff must prove that: (1) he or she suffered intentional discrimination because of his or her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him or her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. 435 F.3d 444, 449 (3d Cir. 2006). In other words, a retaliatory hostile work environment mirrors the general hostile work environment test, except that the discrimination must be because of a protected activity, rather than a plaintiff's protected class.

The evidence fails to support Plaintiffs' retaliation claims against the School District in a variety of ways.  As a preliminary matter, the very language that Plaintiffs selected to set forth this claim in the Third Consolidated Amended Complaint demonstrates that their protected activity was not the reason they allegedly suffered intentional discrimination.  Instead, it demonstrates that Plaintiffs believe race was a major motivating factor in the retaliation, and not their participation in a protected activity.  Third Cons. Am. Compl. at ¶ 96 ("Defendant Ishmael created an environment of hostility and intimidation against the Plaintiffs **because of their race** because they filed racially discrimination charges against her in [sic] with the EEOC and subsequently filed a Federal Complaint related to those charges in May, 2011.") (emphasis added), <u>Id.</u> at ¶ 98 ("The [School District] knew or should have known that Shirl Ishmael would **continue the harassment** and create a hostile work environment **upon her return to Mifflin** school in April, 2012.") (emphasis added).

As discussed above, the most obvious problem with the retaliatory hostile work environment claim is that the alleged conduct was not "severe or pervasive."  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview."  Harris, 510 U.S. at 370.  Ishmael's alleged conduct is certainly not the hallmark of an ideal co-worker, and it is understandable that Plaintiffs would have preferred more amicable interactions with her.  However, nothing about Ishmael's conduct is so troubling, either individually or collectively, that a reasonable person would find it hostile or abusive.  Indeed, Ishmael's alleged conduct appears to be in line with the type of conduct that one might anticipate following a charge of discrimination and lawsuit against a co-worker.  See Jensen, 435 F.3d at 452 ("When one employee makes a charge under Title VII against another, some strain on workplace relationships is inevitable . . . Sides will be chosen, lines will be drawn, and those who were once the whistleblower's friends may not be so friendly anymore.").  Ishmael's alleged conduct also appears to be in line with the type of "petty slights or minor annoyances that often take place at work and that all employees experience." Burlington N., 548 U.S. at 68.  That there will likely be some uneasiness following the filing of a complaint is not what makes Ishmael's alleged conduct not actionable, rather, it's that Ishmael's alleged conduct appears to be consistent with simple teasing, offhand comments and non-serious isolated incidents that do not amount to an actionable hostile work environment claim.  Fagher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

The School District's motion for summary judgment on this portion of the claim will be granted.

### E.    Count VI – Punitive Damages

In Count VI, Plaintiffs set forth a claim for punitive damages against Gilbert, Ishmael, and Ray under an unspecified legal theory.  I must assume that the request for punitive damages is tethered to the § 1983 claims, as the individual defendants are not subject to any Title VII claims, and punitive damages are not recoverable under the PHRA.  Hoy v. Angelone, 720 A.2d 745, 751 (Pa. 1998) ("[W]e hold that punitive damages are not available under the [PHRA].");  Klein v. Weidner, 729 F.3d 280, 288 (3d Cir. 2013) (recognizing that Hoy v. Angelone barred punitive damages under the PHRA).

Summary judgment must be entered in favor of Gilbert and Ishmael as to punitive damages, as summary judgment will be entered in their favor on the underlying § 1983 claim.  To the extent that Count VI is intended to notify the parties and the Court that Plaintiffs are seeking punitive damages against Ray related to Counts II and III, it is so noted and Plaintiffs' request for punitive damages is preserved.[19]  The parties may submit relevant instructions on punitive damages with their proposed jury instructions, and if the parties disagree about whether or how to instruct the jury on punitive damages the Court will address that dispute at the appropriate time.

Because I view Count VI as a request for relief under § 1983, and not a standalone legal claim for relief, summary judgment will be entered in favor of Gilbert, Ishmael, and Ray on Count VI.[20]

An appropriate order follows.

---

[19] "[F]or a plaintiff in a section 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous.  Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendants' actions need not necessarily meet this higher standard." Savarese v. Agriss, 883 F.2d 1194, 1201 (3d Cir. 1989).

[20] This determination will not prevent Plaintiffs from seeking punitive damages against Ray under § 1983, rather it will simply consolidate Plaintiffs request for relief with the underlying counts on which it is based.